IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHRIS JONES,

                Plaintiff,

   vs.                                            CIVIL NO.  04-174 JH/LFG

CITY OF ALBUQUERQUE;
Officers STEVE PICCHIONE,
WOSICK, MASON and MOCK;
Sgt. HEH; ALBUQUERQUE POLICE
DEPARTMENT; GILBERT GALLEGOS,
Chief of Police; ROBERT WHITE, City
Attorney; and DONALD HARRIS,
Assistant City Attorney,

                Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S REQUEST FOR PRODUCTION

THIS MATTER is before the Court following an *in camera* inspection of certain documents

which were withheld from production.  Pursuant to the terms of the Court's protective order,

Defendant tendered the withheld documents to the Court for an *in camera* review.

### Background

Chris Jones' ("Jones") lawsuit arises out of an incident occurring on February 19, 2001.

Jones contends that Albuquerque Police officers illegally searched his locked bedroom in violation

of his Fourth Amendment rights; and that notwithstanding permission to search his bedroom given

by other members of the household, no one had actual or implied authority to consent to a search of

Jones' bedroom.  He further contends that officers Wosick and Picchione obtained a search warrant

based on false and illegally obtained information and, pursuant to the search warrant, opened Jones'

safe and improperly seized $10,000 in cash.  Jones contends that after the seizure, Defendants failed

to deposit his $10,000 into the type of account statutorily required by New Mexico law.

Jones contends that he was never charged with any crime, and that rather than return the seized money as required by state law, the City filed an interpleader action, *City of Albuquerque v. Rodney Goodlow, Chris Jones and David Sommerville*, CV 2003-7887 in state district court. Jones contends that this interpleader action was filed without probable cause or good-faith belief that there were competing claims for his money. Jones contends that even though all other named defendants in the interpleader action disclaimed an interest in the seized money, the City refused to return Jones' money to him. Jones finally asserts that the City maintains an official or actual policy of denying Jones' due-process rights to statutory post-deprivation notice and a hearing on seized property; and, further, that the City of Albuquerque has "an official or actual policy or standard operating procedure of illegally seizing and retaining property in violation of [law] . . . ." (Complaint, Doc. #1, ¶ 57).

In addition to the claims that individual officers violated his Fourth Amendment rights by unlawful searches, seizures and detention, Jones contends that the City has official policies to violate constitutional rights in conducting searches and seizures (Complaint, Doc. #1, ¶ 86), and that its "no settlement policy" in relation to alleged police infractions is unconstitutional (Complaint, Doc. #1, ¶ 88).

Jones also claims that the City of Albuquerque is liable for failure to train and supervise police officers in the "lawful and constitutional execution of duties relating to searches, applications for search warrants and seizures of property" (Complaint, Doc. #1, ¶ 96). So, too, Jones contends that the City has failed to train, hire and supervise city attorneys by allowing "unlawful seizures, retentions of unforfeited properties, [and] the filing of civil lawsuits without probable cause . . . ."(Complaint,

Doc. #1, ¶ 106).[1]

   At or near the same time as the alleged unconstitutional search, seizure and refusal to return Jones' property to him, there were numerous allegations that money, guns, drugs and other evidence were illegally being taken from the Albuquerque Police Department's evidence room. Due to allegations of mismanagement and even of corruption in the operation of the City's evidence room, an investigation was undertaken by the State Attorney General. A second investigation was undertaken as well in the form of a self-critical analysis by the City itself of the policies and procedures relating to the operation of its evidence unit.[2]

   In an effort to obtain open, frank and candid information necessary to improve the evidence room operation and to correct problems, the City conducted interviews with numerous police officials and employees. The interviews were conducted under a promise of anonymity.[3]

---

[1]After the Court reviewed the entire investigative file in this case and completed its analysis on the parties' discovery disputes, and with discovery having ended on October 21, 2005, Jones obtained permission [Doc. 185] to file a First Amended Complaint on December 14, 2005 [Doc. 186] that now seeks to assert specific claims concerning practice and procedures in the City's operation of the evidence room. The amended complaint comes at the close of discovery and no further discovery will be permitted. Discovery in this case has been extended on numerous occasions and no further extensions will be granted.

[2]On March 17, 2005, due to allegations of serious misconduct in the evidence room, the Police Oversight Commission requested that the Chief of Police undertake an investigation concerning these allegations as well as allegations made in pre-determination letters resulting from incidents involving the APD evidence room.
   The investigation was authorized by the Mayor to include:
      Any allegations made against APD captains and/or APD command staff, and any allegations made in pre-determination letters that may have resulted from incidents involving the APD evidence room.

      The investigation should be limited to possible violations of APD SOPs, City personnel regulations, and best practices for police departments of our size. I also welcome your input on reform, particularly where captains have grievances above their rank.
(March 22, 2003 letter from Mayor Martin Chavez to Jay Rowland, Independent Review Officer).

[3]To promote a full, prompt and thorough investigation, the City's Administrative Officer directed City employees to fully cooperate with the independent review officers' investigation pursuant to Personnel Rules

Pursuant to the City's directive and as part of the self-critical analysis, 58 individuals were interviewed; hundreds of hours of interviews were conducted; and 15,000 e-mails of senior officers and "possible target personnel" were reviewed.

This investigation focused on policies and procedures related to the supervision, administration and handling of evidence in the APD evidence room. It also included a physical examination of the evidence room and inventory of items seized. The study included problems with security of the facility, inventory management and cash controls within the APD evidence unit. The investigation included an analysis of auditing systems, communications between the District Attorney's Office and evidence managers, job dissatisfaction by evidence officers, review of

---

and Regulations, Section 303, and to make full, complete and truthful statements concerning the investigation. (April 9, 2005 memo from James B. Lewis, CAO to Jay Rowland and acting Chief of Police Joe Bowdich #0269). Further, APD employees were directed to fully cooperate with investigators concerning "the operation and management of the APD evidence room." The investigation was conducted by the independent review officer pursuant to authority under Section 9-4-1-6(C) and (D) R.O.A. 1994, as well as the APD standard operating procedures, Section 3-43, governing investigations conducted by IRO.

The following individuals were interviewed: Deputy Chief Paul Chavez on May 6, 2005; Deputy Chief Fowler Johnston, April 29, 2005; Deputy Chief Greg Sanchez, April 20, 2005; Deputy Chief Ed Sauer, April 21, 2005; Capt. Conrad Candelaria, April 8, 2005; Capt. Sonny Leeper, April 5, 2005; Capt. Marie Miranda, April 4, 2005; Capt. Jan Mosier, May 13, 2005; Capt. Ron Paiz, April 14, 2005; Capt. Larry Sonntag, April 28, 2005; Lt. Kyle Baxter, April 22, 2005; Lt. Gary Grandberry, April 29, 2005; Lt. Paul Feist, April 28, 2005; Lt. Steven Tate, April 29, 2005; Lt. Steven Warfield, April 12, 2005; Sgt. Art Acosta, May 24, 2005; Sgt. Chris Bakas, May 17, 2005; Sgt. Allen Banks, May 17, 2005; Sgt. Brian Carr, May 5, 2005; Sgt. Don Chavez, May 4, 2005; Sgt. Beth Paiz, April 13, 2005; Det. Robin Burge, June 3, 2005; Det. Timothy Harrington, May 5, 2005; Det. Steve Lopez, May 11, 2005; Det. Michael Martinez, April 26, 2005; Det. Brian Miller, April 19, 2005; Det. Christine Munsie, April 27, 2005; Det. Cynthia Orr, April 6, 2005; Det. Steve Vining, May 11, 2005; Det. Art Younger, May 25, 2005; Officer James Hopper, May 16, 2005; Officer P.J. Montoya, May 26, 2005; Officer Dierdre Peer, May 12, 2005; Officer Eric Peer, April 18, 2005; Officer Germaine Wilkins, May 26, 2005; Roy Turpen, May 9, 2005; Det. Mary Adams, March 31, 2005; Karen Fischer, May 2, 2005; Alton Adams, May 4, 2005; Don Hoffman, May 25, 2005; Laurel Duhr, May 12, 2005; Mary Legler, May 20, 2005; Don Wencewicz, April 29, 2005; Josie Laing, April 29, 2005; Janie Miller, May 25, 2005; Lisa Hicks-Wade, May 25, 2005; Lisa Keiser, April 28, 2005; Maria Reteria, May 23, 2005; Lynn Black, May 25, 2005; and Chris Sage, April 14, 2005. Det. Patty Flannagan was scheduled for an interview, but Det. Flannagan (retired) never returned the call to schedule an appointment. Ann Talbot, Director of the Metropolitan Forensic Science Center, was asked to schedule an investigation, but, through her attorney, Patricia G. Williams, declined to make herself available for an interview. Kelly Sandoval was sought to be contacted, but the request was returned as "attempted not known." Thus, she was not interviewed.

accounting practices, impact of leadership or lack of it in evidence room operation, sexual and gender issues relating to personnel, labor management issues, and union activity.  Information related to alleged employee harassment, employee relations was also presented.

Following an *in camera* review of the interviews and investigative report, the Court now determines that these documents should not be provided to Plaintiff.

## Analysis

The City argues that police investigations such as the one involved here are made under a veil of confidentiality, and it would contravene public interest and would impair the functioning of the police department if results of the investigation were disclosed.  Defendants contend that destruction of confidentiality would impede candid and conscientious self-evaluations of the Department's actions.  Thus, they argue that a critical analysis privilege should prevent disclosure of the investigative records to Jones.  Frankenhauser v. Rizzo, 59 F.R.D. 339, 342 (E.D. Pa. 1973).

Just as there are limits to the privacy interest consideration claimed by police officers in reference to Internal Affairs and personnel files, *see, e.g.*, Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir. 1989)(*citing* Whalen v. Roe, 429 U.S. 589, 599 & n. 24, 97 S. Ct. 869, 876 & n. 24 (1977)); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986), there are also limitations on the self-critical analysis privilege.  It is not absolute.

For one thing, many courts simply do not accept the proposition that disclosure of internal investigations will chill a participant's impulse to be candid, pointing out there are no empirical studies to support this "chilling" contention.  *See, e.g.*, Kelly v. City of San Jose, 114 F.R.D. 653, 664 (N.D. Cal. 1987); King v. Conde, 121 F.R.D. 180, 193 (E.D.N.Y. 1988) ("[w]ithout some basis for believing that real police officers conceal or distort their statements to internal investigatory bodies, courts should reject this contention"); Frankenhauser at 344 (rare instances of disclosure pursuant

to a court order would not deter citizens or officers from candor); <u>Denver Policemen's Protective Ass'n v. Lichtenstein</u>, 660 F.2d 432, 437 (10th Cir. 1981)(it is doubtful that citizens and police officers will absolutely refuse to cooperate in investigations because of a few isolated instances of disclosure).

Indeed, many courts feel that allowing "fresh air" into investigations would have the opposite effect, as the officers' knowledge that their statements and work product will be subject to demanding analysis by people with knowledge of the events under investigation and considerable incentive to make sure that the truth comes out, i.e., a civil rights plaintiff and her lawyer, the officers are more likely to increase rather than decrease candor. <u>Kelly</u> at 665. Furthermore, the government's interest in maintaining confidentiality must be balanced against the interests of those seeking discovery of the material, given the principle of broad and liberal discovery generally followed in the federal courts, as well as the important policy interests behind civil rights statutes. <u>Denver Policemen's Protective Ass'n</u> at 437.

It is generally accepted that, although there will be situations where police investigative files and reports have to be kept confidential in order to protect public interests, non-disclosure can come only after balancing the need for discovery against the particular reasons advanced to support confidentiality. <u>Crawford v. Dominic</u>, 469 F. Supp. 260, 262 (E.D. Pa. 1979).

Whenever the police investigative privilege is asserted, as it is here, the Court is required to balance the public interest and the confidentiality of governmental information against the needs of a litigant to obtain data, not otherwise available to him, with which to pursue a non-frivolous cause of action.

In this case, Jones does not allege that the problems which led to retention of his $10,000 had

6

anything to do with the operation, maintenance or record keeping of the APD evidence unit.[4]  To the contrary, Jones contends that the $10,000 was seized and thereafter deposited into a bank account, but the deposit failed to comply with specific requirements of law under New Mexico forfeiture statute, NMSA 1978, § 31-27-8.[5]

Jones does not contend that the individual officers stole his money from the evidence room, as was alleged in other incidents investigated by the oversight commission investigation, but, rather, that APD impeded his right to have the money returned to him by initiating an interpleader action asking the court to determine ownership of the seized funds.  Thus, the circumstances giving rise to Jones' claims in this lawsuit are materially different from the claims that gave rise to the police oversight commission's self-critical analysis investigation relating to evidence handling procedures in the APD evidence unit.

The applicability of investigative or the self-critical analysis privilege is discussed in Frankenhauser v. Rizzo, *supra*.  The Rizzo court (59 F.R.D. at 344) set forth a number of factors that a court should consider in applying a balancing test to discovery of police investigative files in a civil rights case.  Those factors include:

1.  The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;

---

[4]As noted in footnote #1, after the close of discovery and after viewing all disputed discovery requests based on Jones' complaint, on December 14, 2005 the Court authorized the filing of a First Amended Complaint, which asserts malfeasance in the operation of the evidence room.  This memorandum addresses the issues existing prior to December 14, 2005.

[5]While Jones asserts that Defendants violated NMSA § 31-27-8, that statute was not passed until 2002.  Its effective date was July 1, 2002.  *See* History:  Laws 2002, Ch. 4 § 8.  There was no predecessor statute.  Based on the dates alleged in paragraph 13 of Jones' Complaint, NMSA § 31-27-8 did not exist at the time of the seizure alleged in this case.

2.  the impact upon persons who have given information of having their identities disclosed;

3.  the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure;

4.  whether the information sought is factual data or evaluative summary;

5.  whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding, either pending or reasonably likely to follow from the incident in question;

6.  whether the police investigation has been completed;

7.  whether any intra-departmental disciplinary proceedings have arisen or may arise from the investigation;

8.  whether the plaintiff's suit is non-frivolous and brought in good faith;

9.  whether the information sought is available through discovery or from other sources; and

10.  the importance of the information sought to the plaintiff's case.

The Court will consider these factors in the reverse order, as it has been held that the weightiest of these factors is the last one, the importance of the information to the plaintiff's case.  Crawford at 263.

In the present case, the police oversight commission's investigation into operation of the City's evidence room is not particularly relevant to Jones' claims concerning how the $10,000 seized from him was handled.  The thrust of Jones' lawsuit is that his property was subjected to unlawful detention; that the information utilized to obtain a search warrant was false or misstated; that following seizure of the $10,000 from the safe, the City deposited the money into a bank account, but not in strict conformity with forfeiture laws; and that following the City's decision not to prosecute criminal charges, the City failed to return the evidence to him, and instead filed an interpleader action.

These allegations do not touch on any of the factors investigated during the City's self-critical analysis of the operation of its evidence room.[6]  That investigation focused on record keeping and inventory, access to evidence, supervision, physical plant, development and enforcement of standard operating procedures, chain-of-command issues, favoritism, cronyism, union/political interference and management issues.  The Court concludes that the information sought is not important to Jones' case.  Thus, disclosure of this information is not relevant to Jones' claim or the City's defenses, nor is it likely that disclosure of the investigative report would lead to the discovery of relevant, admissible evidence.

Even if the material were relevant, consideration of the remaining <u>Frankenhauser</u> factors compels the conclusion that disclosure is inappropriate in this case.  The Court must consider if the information sought by Jones from the oversight commission's investigation is available from other sources.  The answer to that question is "yes."   The oversight commission's report is not a "sole source."  All of the individuals who provided statements have been identified.  Had Jones chosen to pursue discovery from those original sources, he could have secured information from them.  By identifying individuals who were interviewed, and to the extent the Court authorized the maximum number of depositions, Jones could have obtained discovery from anyone whose evidence is relevant to the parties' claims or defenses under Rule 26.[7]

The next factor is whether Jones' suit is non-frivolous and brought in good faith.  There is no contention, and the Court finds, that Jones has stated an actionable claim and is not pursuing this case for some improper purpose.

---

[6]As previously noted, the amended complaint asserts issues relating to the evidence room.

[7]The discovery deadline in this case has been extended many times.  Discovery is now closed and will not be re-opened.

The Court must also consider whether intra-departmental disciplinary proceedings have arisen or may arise from the investigation.   In this case, they have.   As a result of the findings and recommendations made during the course of the oversight commission's self-critical analysis investigation, various police officials and employees were disciplined, transferred or were affected by personnel actions related to the investigation.   Moreover, some disputes concerning the personnel actions remain pending.

The Court must consider whether the police investigation is complete.   While the statute of limitations applicable to potential criminal charges has not run, the scope of the investigation authorized by the Mayor was not directed at criminal prosecutions.   To the contrary, the Mayor's directive was, "The investigation should be limited to possible violations of APD SOPs, City personnel relations, and best practices for police departments of our size.   I also welcome your input on reform . . . ."   (Mayor's letter to Independent Review Officer, 3-22-05, Bates No. 00266). Indeed, due to the potential for conflict of interest, the Attorney General conducted an independent investigation, but apparently did not make a presentment to a grand jury.   The City of Albuquerque's internal investigation was not directed at criminal prosecutions, but rather to discover and remedy problems within the APD evidence unit.   The police oversight commission's investigation has apparently run its course.

The fourth factor is whether the information sought from the investigation is factual or evaluative.   While relevant facts are generally discoverable, opinions and evaluations are not.   The vast majority of individuals interviewed expressed opinions concerning the operation and maintenance of the evidence room.   While clearly there is factual information concerning who was interviewed and who said what to whom, much of the focus of the investigation involved opinions concerning inter-personal relationships, lack of departmental cohesiveness, political and union issues, and opinions

offered by a variety of sources. So, too, the results of the investigation included evaluative summaries and recommendations for program improvement. The opinions expressed and the evaluations made by the commission are privileged.

These commission's recommendations all fall within the third <u>Frankenhauser</u> factor, which includes the degree to which governmental self-evaluation and program improvement would be chilled by disclosure. As a result of the investigative report, significant changes have been and are being made to the APD's evidence unit. Public policy favors improvements in governmental operation, and if the City is less able to make improvements in other operations of governmental functions because employees would be reluctant to disclose information concerning mishandling of governmental operations, then public policy interests are not served. These public policy interests outweigh Jones' need for information.

In this case it is clear that participants were directed to cooperate and disclose information, and their cooperation was secured by promises of confidentiality. It is far less likely that open, frank and candid discussions would have occurred had the individuals who were interviewed been advised that their statements would be publicly disclosed. So, too, it is unlikely that the City would have been able to modify its internal operating procedures but for the input provided by citizens and employees concerning problems in the APD's evidence unit.

This case differs from a prior case in which the Court ordered disclosure of a city's investigative report when the Court found that the investigation was highly relevant to that plaintiff's lawsuit. *See, e.g.*, <u>Tanberg v. Sholtis</u>, No. CIV 02-348, slip. op. at 17 (D.N.M. Nov. 8, 2002). In that case, the Court stated:

> [I]n that this is an investigation into the incident which is the basis for this lawsuit, almost by definition the file is highly relevant to this lawsuit. The fact that this investigation was made almost immediately

11

> after the incident makes it of even greater relevance.  While [it is unknown] what probability of success plaintiff's suit has, it may well be that if the suit has any chance of success, the keys to it are contained in this file.

*citing* Wood v. Breier, 54 F.R.D. 7, 10 (E.D. Wis. 1972).

In the present case, the investigative materials are not specifically related to Jones' complaint. The investigation was not initiated in close proximity to the seizure of Jones' property and was not an investigation into facts or circumstances related to the seizure of Jones' money.  *Compare* Frankenhauser v. Rizzo at 345 ("Plaintiff's need for the facts contained in the police investigative files is manifest.  The police investigation was conducted promptly after the incident occurred and certainly should be comprehensive and reliable").  There are no interviews relating to the Jones incident and no discussion whatsoever about the forfeiture statute.  The investigation does not deal with search warrants and does not concern itself with alleged improper detentions or alleged improper searches or seizures.

While there may be some relevant information about management and operation of the evidence unit, that information is only tangential to Jones' claims even with the First Amended Complaint.  On balance, the scales tip in favor of non-disclosure.  In Burka v. U.S. Department of Health & Human Services, 87 F.3d 508, 517 (D.C. Cir. 1996), the court noted that it may properly balance a requester's need for information from a particular source; it may balance the importance of the requested information to the litigation; and it may consider the burden of producing the information or the difficulty which would be caused by the production.

Using this approach in Burka, the Court determines, on balance, that the investigative report should not be provided to Jones.  The same information was available from other sources and the information in the investigative report is not particularly important to the litigation.  The burden of

12

production here is not in the difficulty of compiling the information, as it has already been compiled, but the burden on government's ability to secure open, frank and candid information in new investigations.

The Court determines that the materials contained in the investigative files constitute evaluative summaries as opposed to straight factual data.  In <u>Denver Policemen's Protective Ass'n</u>, the Tenth Circuit approved the state court judge's restriction of disclosure to facts, as opposed to opinions or policy decisions which were exempt from discovery. So, too, in <u>Wood v. Breier</u> the internal police file sought to be produced consisted of only factual material including first-hand reports of police officers, investigators, and summaries of interviews with police officers relating to the incident that gave rise to the lawsuit.  Such is not the case here.  As noted, this report does not deal at all with Jones' claims or the seizure of money from his safe.

Finally, even though the federal law of privilege applies in civil actions in which the federal law supplies the rule of decision, *see, e.g.*, <u>Gilbreath v. Guadalupe Hospital Foundation, Inc.</u>, 5 F.3d 785, 791 (5th Cir. 1993); <u>EEOC v. Illinois Dept. of Employment Security</u>, 995 F.2d 106, 107 (7th Cir. 1993), it is still appropriate to consider the existence of state precedent recognizing a particular privilege.  *See* <u>Jaffee v. Redmond</u>, 518 U.S. 1, 7-8, 12-13 116 S. Ct. 1923, 1926-27, 1929-30 (1996).

Thus, while not bound by a state court's analysis, the Court has reviewed precedent in the forum state and determines that the State of New Mexico recognizes this type of privilege.  In <u>State ex rel. Attorney General v. First Judicial District Court</u>, 96 N.M. 254, 629 P.2d 330 (1981), the New Mexico Supreme Court upheld the Attorney General's claim of a similar privilege to prevent disclosure of information collected by the State during the investigation of a State Penitentiary riot. The executive privilege claimed by the Attorney General was intended to protect the decision making process in government by encouraging frank and candid conversations.  While the privilege claim in

the present case is not the same "executive" privilege involved in <u>State ex rel. Attorney General v.</u>

<u>First Judicial District Court</u>, the policy considerations are the same.  That is, to promote open, frank

and candid discussions about a government's process and to develop approaches to solve significant

problems.  The court noted:

> Inherent in the successful functioning of an independent executive is
> the valid need for protection of communications between its members.
> The purposes of the executive privilege are to safeguard the decision-
> making process of the government by fostering candid expression of
> recommendations and advice and to protect this process from
> disclosure.   Executive personnel who fear or expect public
> dissemination of their remarks may temper their comments because of
> their concern for their own personal interests, safety or reputation.

<u>Id.</u>, 96 N.M. at 258, *citing* <u>United States v. Nixon</u>, 418 U.S. 683, 94 S. Ct. 3090 (1974).

In <u>State ex rel. Attorney General v. First Judicial District Court</u>, the state supreme court

recognized the existence of this important privilege, but also noted that it was not absolute.

> The need for confidentiality among the executive is worthy of
> protection through an evidentiary privilege.  However, when this
> privilege comes into confrontation with other values or interests which
> are also protected by law, a balancing of the protected interests  must
> be undertaken by the courts.

<u>Id.</u>, 96 N.M. at 258.

The balancing test proposed by the New Mexico Supreme Court is essentially the same test

adopted by the court in <u>Frankenhauser v. Rizzo</u>:

> In administering this balancing test, certain procedures are followed.
> The movant must first show good cause for the production of the
> requested information.  If good cause can be shown, the court must
> then conduct an in camera examination of the requested material.  The
> trial court must be satisfied that the requested material would be
> admissible in evidence and that it is otherwise unavailable by the
> exercise of reasonable diligence.  Once these prerequisites are met, the
> requested information is discoverable provided that the public's
> interest in preserving confidentiality does not outweigh the specific
> needs of the movant.

State ex rel. Attorney General v. First Judicial District Court, *supra*, 96 N.M. at 258.  The state supreme court under this claim of privilege protected material obtained by the Attorney General from corrections officers, executive department personnel and others during the investigation of the causes of the penitentiary riot.

The Court concludes that New Mexico recognized the executive privilege for the same reasons that federal courts have recognized the self-critical analysis privilege.

In sum, after careful consideration of the documents, the Court concludes that the Defendants' claim of privilege should be upheld and that the investigative documents sought by Jones need not be produced.

Lorenzo F. Garcia
Chief United States Magistrate Judge